OLSON, Respondent, v. WASTLUND, Appellant.

(256 N. W. 118.)

(File No. 7664. Opinion filed July 30, 1934.)

*Payne & Olson,* of Vermillion, for Appellant.
*Everett A. Bogue,* of Parker, for Respondent.

POLLEY, J. This action was brought to recover damages for malicious prosecution.

The difficulty out of which the prosecution arose took place on a farm belonging to defendant. Plaintiff was occupying the farm as defendant's tenant. Defendant went to the farm on the morning of the difficulty for the purpose of making some needed repairs on one of the buildings. Plaintiff came out where defendant was at work and an altercation immediately took place. Plaintiff drove defendant off the place with a pitchfork. Defendant then went directly to Vermillion and called at the office of Mr. Payne, his attorney, but Mr. Payne was not in his office and defendant did not get to see him. He then called upon the state's attorney and narrated what had taken place between plaintiff and

defendant. The state's attorney told defendant that the case was one for the board of insanity, and directed defendant to the county judge. After hearing defendant's version of what had transpired and upon the complaint of defendant, the county judge issued a warrant directing the plaintiff to appear before the board of insanity for examination. An examination was had during the afternoon of that same day, and plaintiff was discharged. Plaintiff then brought this action charging defendant with malicious prosecution. Verdict and judgment were for plaintiff, and defendant appeals.

Among other grounds urged for a reversal of the judgment, defendant assigns insufficiency of the evidence to support the verdict and judgment.

Upon the question of want of probable cause and malice, the court charged the jury as follows:

"The law presumes that all men act in good faith in their transactions with their fellow men, so the burden rests upon the plaintiff in this case to prove want of probable cause for the instituting and continuing of the insanity proceeding against the present plaintiff, here in question, by a preponderance of the evidence; other grounds or essentials of the case may be inferred from want of probable cause; but, this particular element of plaintiff's alleged cause of action, viz.: want of probable cause, cannot be inferred from any other facts or circumstances in this case. It must be established by positive and direct proof. It is not enough to show that plaintiff was acquitted of the charge preferred against him, or that the defendant has abandoned such prosecution. The burden of proof is upon the plaintiff in this case to prove affirmatively by the evidence in the case and the circumstances disclosed by the evidence, that the defendant had no sufficient grounds for commencing the said prosecution.

"Probable cause, as the term is used in this charge, does not depend upon the guilt or innocence of the person accused. Probable cause is an honest belief on the part of the prosecutor in the guilt of the accused, based on reasonable grounds. Probable cause implies a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person is guilty of the offense charged."

No exceptions were taken to this instruction. It is therefore the law of the case, and, when read in view of this instruction,

we think the evidence is not sufficient to establish either want of probable cause or malice.

Plaintiff was occupying defendant's farm under a written contract which, among other things, provided that defendant had the right to go upon the premises and fence and improve the buildings at any time. On the occasion of the difficulty, defendant had with him a hammer and a wrecking bar about three feet in length. He proceeded to do some repairing on the granary, but before any work had been accomplished plaintiff appeared on the scene with a pitchfork in his hands. Just what took place then is a matter of dispute, but it is not claimed that defendant interfered with or in any way molested plaintiff, and plaintiff admits that he immediately ordered defendant off the place. When defendant said he had a right to come on the place to make needed repairs, plaintiff called him a liar, and said: "Now you get. You get off the place. Don't show your face on the place again while I am here unless I call you." Defendant testified that plaintiff threatened to run the pitchfork through him if he did not leave the place, and, according to the testimony of both defendant and plaintiff, defendant went to his car as fast as he could and got in and drove away. Plaintiff swore positively that he did not have a pitchfork in his hands, but later on in his testimony plaintiff admitted that he did have a pitchfork in his hands, but said that he did not threaten to run it through defendant.

As a justification for the tirade of abuse plaintiff admits he poured out upon defendant, he said that immediately after he went out to where defendant was working on the granary, defendant, without any provocation whatever, struck at him with the hammer. On cross-examination, however, he modified this statement in answer to a question by defendant's counsel: "I said Mr. Wastlund made a pass at me with the hammer. Whether he meant to hit me or not I do not know. I am sure he made a pass at me with the hammer. I seen it just as he went by."

During the altercation between plaintiff and defendant, plaintiff's wife came upon the scene. She was called to the stand as a witness for plaintiff and testified: That defendant was hammering on a post to get it back in place; that plaintiff had a pitchfork in his hands; that they had some words. "I told plaintiff to go on. I said: 'He is trying to make out you are crazy.' I said: 'Go on

and let him alone' I told defendant I did not want any trouble with him, and to go away. Defendant did not talk very loud. 'He talked so you could understand what he said.' Plaintiff 'when he gets excited talks pretty loud. He did talk pretty loud that day, but he didn't act crazy. I saw Mr. Wastlund swing the hammer.'"

While Mrs. Olson was on the stand she was asked: "Do you remember making the statement that you thought Ole was crazy?" And she answered: "One time I did. I didn't want him to rent the place because he was so excited about everything. I didn't want Mr. Wastlund to rent the place to him." She was asked this question:

"Do 'you remember just where it was and when it was that you intimated to Mr. Wastlund that Ole was crazy? A. No, I don't.

"Q. Did you ever make a statement of that kind to Mr. Wastlund? A. Not that I remember. I may have said something about the time he got overcome with the heat. He was pretty bad then. It was the hot sun, and excitement over the fire.

"Q. Did you say he was crazy or had a sunstroke? A. For a time I was so excited I don't remember what I did say. I didn't say he was crazy."

Again she was asked:

"Do you remember having told anybody, Mrs. Olson, that Ole was crazy? A. I don't know just how to answer that question—whether I should call it crazy when he had those spells or whether weakness and he was out of his head. It only lasted for a little while when he had those spells. They didn't last over fifteen minutes.

"Q. How did he act when he had those spells? A. Sometimes he would get up and run and sometimes he would sit and holler and clinch his hands."

It appears from the testimony of plaintiff's wife and of some of their neighbors that during the summer of 1929 plaintiff was subject to "spells" when he was abnormal—deranged, as one of the witnesses said—during which he was wholly irresponsible.

Plaintiff may not have been crazy, as that term is generally understood, nor usually violent in his attitude toward other people, but angry and excited, as he was on the morning of the difficulty with defendant, and, armed with a pitchfork as he was at that

time, he was dangerous and rendered it dangerous and unsafe for defendant to go upon his own premises.

█ Under the law as given to the jury by the court, the evidence in the record falls far short of proving want of probable cause, if indeed it does not affirmatively prove probable cause. Plaintiff's neighbors knew of his unbalanced condition, and had known of it for some time before the defendant made the charge of insanity. Knowledge of this condition had also come to the defendant before the complaint was made. Plaintiff's wife was well aware of plaintiff's condition, and it was she who first suggested the fact that plaintiff was crazy and might get himself into the insane asylum.

█ It will be noted that defendant did not act wholly upon his own volition in making the complaint against plaintiff. He first tried to consult Mr. Payne, but, not finding Mr. Payne in his office, he went to the state's attorney, who advised him to take the case to the county judge, and it was the county judge who issued the warrant. It does not appear from the evidence, however, that defendant made a full and fair statement of all that had taken place between plaintiff and defendant, and therefore does not tend to prove probable cause.

It is our view that plaintiff has failed to sustain the burden of proof of want of probable cause and malice, and that the judgment must be reversed.

The judgment and order appealed from are reversed.

ROBERTS, P. J., and CAMPBELL, WARREN, and RUDOLPH, JJ., concur.